Peace number 235293 Allen Josephson versus Toni Ganzel et al. Oral argument not to exceed 15 minutes per side. Mr. Rogers for the appellate. You want to just wait a minute let let the courtroom get settled here. All right. Good morning. Good morning, Your Honor. Jeremy Rogers for the appellate. And I would like to reserve five minutes for rebuttal. Very well. May it please the court. This is a case that demonstrates a principle that if one stretches enough that what one is stretching will break. And that happens to be the critical issue of qualified immunity at issue in this appeal, which is an interlocutory appeal of a district court's denial of summary judgment. Unlike the case that we just heard about, which I think Judge Griffin you aptly point out the difference between a 12b6 motion and a summary judgment motion here. Here we have six separate individual University of Louisville officials or former University of Louisville officials in some cases. And the law is very well established that in order to make a 1983 claim against any of these individuals that it must be shown that that particular individual violated the plaintiff's constitutional rights. Here we have a situation where from the pleading stage up until really today, the plaintiff has tried to cast this case really as like a civil conspiracy type of theory. Although that's not been pled. And if you read the plaintiff's appellee brief, you see the word defendants used I think over 150 times to say defendants did this, defendants did that. But the issue before the court on qualified immunity is a pointed one that looks at the perspective of the individual defendant here. And critically the question is would a reasonable official in that defendant's position know that what that defendant did violates the plaintiff's constitutional rights at the time it occurred. Here the problem is that the allegation of, for example, Defendant Woods who was gone from the university a year before the plaintiff was gone from the university and there's no evidence or even an allegation that Defendant Woods had anything to do with the non-renewal of the plaintiff's appellee appointment, for example. He asked him to step down from the chief position. Isn't that the allegation related to him? It is, Judge Mathis, it absolutely is. The problem with that is as we pointed out in our initial motion to dismiss before the trial court is that occurred more than a year before the lawsuit was filed. And so upon being alerted to that fact, the plaintiff filed an amended complaint and expressly stated that the plaintiff is not seeking any relief from the demotion of the division chief role. And so that really is off the table. It begs the question what is it that Defendant Woods, for example, did that violated the constitutional rights of the plaintiff here? And if you take a step back and look at all of the defendants, that same issue occurs with all of them. And when you look at the district court's opinion, the district court laid it out pretty succinctly and pretty pointedly. What is it that each defendant did in the district court's mind that may have violated the plaintiff's constitutional rights? And it includes things like Defendant Lohr stated in an email that the plaintiff's views were, quote, unscientific. Well, how does that violate the plaintiff's constitutional rights in any clearly established way? There's no suggestion that it did here, let alone any citation to any case law that would support such an assertion. What we know is there's a two-step inquiry, and I'd like to just take a step back and talk about the first inquiry here, which is was there a constitutional right at issue here that was violated? And of course, the second inquiry is if so, was it clearly established as unlawful, the violation at the time it occurred? So the question, the threshold question, and I think it bleeds over into both inquiries, is what is the First Amendment right at issue here? Now, the plaintiff alleges that, and has shown that, he gave a panel presentation in October of 2017. Now... To the Heritage Foundation in Washington, D.C.? Correct, Your Honor. And you say that's part of his official duties at the University of Louisville Medical School? It is, Your Honor, if you... To give a presentation to the Heritage Foundation, was he required to do this? Was he specifically required to give this presentation? No, he wasn't. Was he paid by the University to do it? He was paid a salary by the University. No, was he paid to give a presentation at the Heritage Foundation by the medical school? There was no separate compensation for giving that presentation? And was there any repercussions to him if he did not give the presentation at the Heritage Foundation? I don't know that there's any evidence that there would have been a specific repercussion. It's hard for me to say that's part of his official duties to speak to a conservative advocacy group in another city, and that's part of his official duties at the University of Louisville Medical School. That's where I don't... I understand the point, Judge Griffin, and it's not an invalid one. Well, if he speaks as a private citizen, he has a First Amendment right, does he not? And there's a 1983 cause of action for retaliating against him for exercising his First Amendment rights as a private citizen, right? As a general proposition, those statements are true. In this case, I would point to your question, Judge Griffin, I would point the court to the allegations that Josephson himself made in his complaint, and in his amended complaint, and which were parroted succinctly by the district court in its opinion. That is, in the amended complaint, for example, paragraph 62, Dr. Josephson talks about how he's given at least 29 invited lectures, 130 presentations to national and international groups, at least 43 presentations to regional groups on issues related to child psychiatry. He goes on, it's paragraph 73 of his amended complaint, to tout how when he arrived, the division was struggling, because it's, among other things, its faculty rarely made national presentations, on and on. And then this culminates in paragraph 78 of the amended complaint. I'm sorry, paragraph 78 of the amended complaint. In light of these accomplishments, Dr. Josephson received a perfect score, 4.0, across the board, in his 2014, 2015, and 2016 annual reviews. He himself is touting how these types of presentations may not be specifically compensated on a per-presentation basis, but it's part of the role. And he's proud of that, that that has become a part of the role, and that he did so much of that. So it's not completely divorced from his duties. I would say, from the Garcetti standpoint, the real point that I'm trying to convey to the court is about- Does Garcetti even apply to this particular situation? Well, it's a really good question, Judge Mathis. I'm not convinced it does, but what I am convinced of is that at the time that the actions were taken in this case, 2017, 2018 primarily, and then the first couple of months of 2019, this is before the court's ruling in the Merriweather case, about academic freedom and about the non-applicability of Garcetti. It didn't seem like Merriweather was announcing anything new. I mean, the opinion specifically says, we reaffirm our conclusion after it talked about previous Sixth Circuit and Supreme Court cases that indicated that that type of speech was protected. Well, I think that what- first of all, Merriweather was a 12B6 ruling. It was not on immunity or qualified immunity. So the lesson that I take from Merriweather is that while before Merriweather, there may have been some grayer area about what is or is not protected speech under the Garcetti framework for a professor, and that's just one piece of it. The other piece here is, just in that first inquiry, the Pickering balance, which this court has even used recently in a faculty free speech case, Gruber v. Tennessee Technical Board of Trustees, the unpublished case from just May of this year. And Judge Griffin, I think you were on that panel. And the question there is slightly different, but it did involve faculty speech, not in the classroom, but in terms of faculty members handing out flyers on campus. Flyers or leaflets, obviously, historically are traditional First Amendment activities. But in that case, the court applied the Pickering balance and said that there was no First Amendment right. And that was a faculty retaliation theory. The point here is that when you look at any one of the individual defendants in this case and apply the touchstone inquiry of qualified immunity, was the law so clearly established that it was beyond debate that what that individual defendant was doing was a violation of Josephson's constitutional rights? And here the answer has got to be no. And this is not a sufficiency of the evidence argument. This is as alleged, as found by the district court, specifically in its opinion. It's true, Dr. Lohr, I said, the unscientific email, and on and on with each defendant as we've laid out. And so I see my time is running out, and unless there are any other questions, I will preserve my rebuttal. Further questions? Judge Gilman? Judge Mathis? All right. You'll have your five minutes rebuttal, Mr. Rogers. Thank you, Your Honor. Good morning. Thank you, Your Honors. My name is Travis Barham. On behalf of the appellee, Dr. Alan Josephson, who is here with us today, may it please the court, we're here on an interlocutory appeal, which means, as Judge Gilman noted earlier, we have to take the facts in the light most favorable to Dr. Josephson. Those facts are that Dr. Josephson led this division for almost 15 years. He turned it around. He put it on the map. He had perfect marks on his annual reviews for three consecutive years, as my colleague on the opposite side admitted. In the fall of 2017, he spoke at the Heritage Foundation, and all of a sudden, his career trajectory radically changed. And that was because a few faculty members did not like views that he expressed on his own time, hundreds of miles from campus, on a hotly contested issue of public importance. Any reasonable official in the aftermath of the Hardy decision would know that that violated a clearly established right. And defendants here raised the same issues. Judge Mathis noted that Meriwether didn't really change the law at all. It just reaffirmed the basis of Hardy, and Hardy established that the notion that faculty members do not have free speech rights when they speak on campus is totally unpersuasive and fantastic. Defendants are arguing for an even more radical position, which is faculty members don't have any free speech rights to speak off campus, and yet the entire notion of the public employee free speech doctrine is that you have more right to speak off the job than on the job. Judge Griffin, you noted that it's hard to say that these were part of his official duties when his invitation to the Heritage Foundation came as a result of his expert testimony, which defendants admit below was not part of his official duties at all. And then he spoke on his own time. The Heritage Foundation paid for him to come and speak there. There were no repercussions if he spoke there, or if he had declined the invitation. So it's clear that he was speaking as a citizen. The Supreme Court in Janus says that he was speaking on a matter of public concern, the issue of gender identity. And it's clear- Actually, your client's seeking reinstatement, and he wants anything that's bad in his file to be expunged. Is that correct? We're seeking reinstatement, your honor, and damages for the dismissal.  And it's clear here that defendants took adverse actions against Dr. Josephson. Opposing counsel suggests that we've never identified what each defendant did. That's simply false. We've clearly identified how defendants would, Boland, Lee, Carter, and Lohr, ban Dr. Josephson from treating LGBT patients, something they did to no one else. We've identified how Woods, Boland, Lee, Carter, and Lohr took away his teaching duties, how they banned him from faculty meetings, how they banned him from meeting with fellows alone, how they removed psychology trainees from his tutelage. And more fundamentally, we've alleged how each of these defendants participated in the termination decision itself. Defendant Ganzel made the decision based on recommendations that she received from Defendant Lee and Defendant Boland. Defendant Lohr volunteered, even though he was no longer a division chief, he volunteered to scrutinize Dr. Josephson's record in order to come up with pretextual reasons for getting rid of him. And Defendant Carter was in the background telling all of them, we need to generate strong documentation to avoid Allen's reappointment. And in response to that, Defendant Boland says that the dean is aware and supportive of what we and you are doing. So all of them were involved in this effort to get rid of Dr. Josephson. So there's no question that they took at least two adverse actions against Dr. Josephson, and it's clear from the record that the only reason that they did this was because of his speech. At least the district court said if you look at the facts, in the light most favorable to Dr. Josephson, a jury could reach that conclusion. That was a very reasonable decision. This case does belong before a jury. Is the demotion still at issue? Your friend on the other side suggests that it's not. The only thing that we're really looking at is the non-renewal. We're looking at the non-renewal, Your Honor. We're not seeking relief for the demotion. The facts related to the demotion, though, provide some of the basis for what motivated the hostile environment that defendants created and then the termination. What adverse action do we have from Woods if we're not looking at the demotion? Defendant Woods is liable for helping to create the hostile environment that then contributed to the adverse action, the termination after he left. What did Woods do? He banned Dr. Josephson from treating LGBTQ patients, something they did to no one else. Defendant Woods took away Dr. Josephson's teaching duties or participated in that decision. Defendant Woods banned Dr. Josephson from faculty meetings. Defendant Woods also ignored the concerns that Dr. Josephson raised about the inappropriate leaking of employment actions. These actions easily qualify as components of a hostile environment. Under the Jordan case and under the Waldo case that we cited in our briefing below, these actions qualify as contributing to a hostile environment. Now what my friend opposite wants to do is he wants to split up the hostile environment allegations into discrete parts and then examine each part separately, but the Jackson case says that you cannot disaggregate the allegations of a hostile environment. You have to treat them as a whole because otherwise you rob the incidents of their cumulative effect. What they're trying to do, piecemealing things, is simply inappropriate, but regardless we have the termination. The termination is clearly an adverse action. The district court said that a jury could easily conclude that defendants did this because of his speech and therefore this is a jury question. Now I wonder, is there any distinction in the law between, say, he wasn't like an at-will employee and it was terminated, in your view, because of First Amendment retaliation. His contract was up for renewal and they just didn't renew it. Now, is it possible they could say, look, we don't have to renew a contract, that requires both parties to consent, and we can non-renew for any reason. Your Honor, that's certainly true. They cannot renew for any reason. The Fritz case says that the traditional adverse actions include non-renewal of a contract and the heart of a First Amendment retaliation case, according to this court's decision in Wink, is that an act taken in retaliation is actionable under 1983, even if the act when taken for a different reason would have been proper. So if they had not renewed his contract for some reason unrelated to his speech, perhaps that would be fine, but here there's evidence that they decided not to renew his contract as part of the quote, effort to generate strong documentation to avoid Allen's reappointment that Defendant Carter outlined and that all the defendants signed on to. They all participated in that, and therefore this non-renewal is a violation of clearly established law. Would that be an issue of fact if their reason for non-renewal was separate from the speech issue? And this is summary judgment, and on summary judgment we take the facts in light most favorable to the non-moving party, and so does that answer the question? You are exactly correct, Your Honor. Would that be a jury question, if that were their defense? If that was their defense, that is a defense they can present to the jury, and a jury should be able to decide that, and that's what the district court said, and the district court was right. All right. Thank you. If there are no further questions? Any further questions, Judge Gilman? Judge Mathis? Thank you, Your Honor. Thank you, counsel. Five minutes rebuttal. Mr. Rogers? Thank you, Your Honor. May it please the court. I'll try to be brief, maybe not even take the full five minutes. The Jackson case cited by opposing counsel, not a 1983 case, a Title VII hostile work environment case, very different scenario because we know, unlike Title VII, which has vicarious liability responding out superior for an employer, 1983 requires for a constitutional violation that an individual be held to what that individual did. There's no collective or vicarious liability under 1983, so apples and oranges in this case. As I listened to the argument of opposing counsel, I continued to hear a lot of they did this and they did that, and it was a component to a larger hostile work environment. Those things just don't work under 1983. Every individual defendant, the claim, including qualified immunity, must rise and fall with the actions of that individual defendant. Now, I would also point out that aside from constitutional protections on the one hand, we have what constitutes an adverse action here. Now, obviously, the courts have held that there are clear things such as a termination, an arrest, threats of physical violence that can constitute an adverse action. Here we have a termination, but the allegation or evidence that each and every one of the six defendants who's before this court as an appellant was somehow responsible legally for that non-renewal decision, it's just not there. Isn't that a factual issue for the jury as well? If there are facts and evidence that could support it, sure, but ... They've made the allegations, haven't they? You dispute them, but that's a jury issue. If there is, in fact, a factual predicate for the idea, but it's not a jury question, you don't get to a jury just on a hypothetical, and that's all we have here. I would commend the court to the December 2022 decision that this court rendered in an unpublished case, I don't know if I'm pronouncing it right, Yerkes v. Ohio State Patrol, 2022 U.S. Appeal Lexis 3526-0. There, the court collected a series of cases from the Sixth Circuit dating from 1999 up through 2012 for the idea that in First Amendment retaliation cases, the holdings of this court contradict the notion that individuals who are not final decision makers can be held liable for the actions of the final decision maker, even in the retaliation context. There is a question about whether or not that even works under the law, but the real question that the court need not address that first one, if the court answers the real question here, which is, was there clearly established law that at the time any of these defendants took the actions that any evidence suggests they took here, not hypotheticals, but the actual evidence in the case, was the law clearly established that those, that that action... Some of the six, I assume, were final decision makers here, weren't they? Well, the dean of the law, of the law, of the medical school, Tony Gansel, was the decision maker who had to sign off on a non-renewal. The evidence was that she did so, as she always does, just on the recommendation of her department chair. In this case, that was the department chair... Another defendant. You got one, you got two, okay. And then it gets more and more attenuated down the line until you're back to, for the want of a nail, the shoe was lost with Woods, who wasn't even at the university the full last year that the plaintiff was at the university, to the demotion piece. Wasn't there a meeting where, I think, three of the defendants met with the plaintiff and told him he would be non-renewed? Did that take place? Yes, your honor, it did. It took place in the spring of 2019, and that was the... How would individuals be considered decision makers as it relates to the term, the non-renewal? As I recall, the meeting was the department chair, which was Boland, and the then sole division chief, which was Dr. Lee. Now, the decision maker really, ultimately, was the dean of the medical school on the recommendation of Dr. Boland. But that's the... I mean, you say that they can't be lumped together, but once the dean is relying on the recommendations of the other, they are lumped together, aren't they not? One is part of the other. I mean... That's the effort, but that's not the law under 1983. Each one must be judged on their own individual actions. And so to say... No, I agree with you. To say that... We view each one individually. Right. I got you there, but here, it seems like collective action is required for the ultimate termination, that's all. The allegation is that they're all part of the decision here. That seems to be the suggestion, Your Honor, but there's not been a civil conspiracy claim. We view the evidence and the like most favorable to the non-moving party. I gather your strongest argument is to peel off Woods. Well, I think Woods, certainly. I think Dr. Lohr and Dr. Carter, none of whom the evidence really shows was involved in the termination decision. And if you look at the district court's opinion, the evidence is that they did things that Dr. Josephson wasn't even aware of at the time. I don't know how that creates a hostile work environment when you don't know... We'll look at each defendant individually and carefully, for sure. All right, you're out of time. Any further questions, Judge Gilman? Judge Mathis? Thank you, Mr. Rogers, for your argument. Case will be submitted. May call the next case.